**IN THE COURT OF APPEALS OF IOWA**

No. 13-1884
Filed October 29, 2014

**IN RE THE MARRIAGE OF MATTHEW MORRIS**
**AND ALLISON MORRIS**

**Upon the Petition of**
**MATTHEW MORRIS,**
        Petitioner-Appellee,

**And Concerning**
**ALLISON MORRIS, n/k/a ALLISON WALSH,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Lee (North) County, John G. Linn,

Judge.


        Allison Morris, now known as Allison Walsh, appeals the physical care,

child support, and property distribution provisions of the decree dissolving her

marriage to Matthew Morris.  **AFFIRMED.**


        Stephen T. Fieweger of Katz, Huntoon & Fieweger, P.C., Moline, Illinois,

for appellant.

        Daniel L. Bray, Lori L. Klockau, Chad A. Kepros, and David M. Cox of

Bray & Klockau, P.L.C. , Iowa City, for appellee.


        Heard by Danilson, C.J., and Doyle and Tabor, JJ.

**DANILSON, C.J.**

Allison Morris, now known as Allison Walsh, appeals the physical care, child support, and property distribution provisions of the decree dissolving her marriage to Matthew Morris. She first contends the district court erred in placing the parties' two children in Matthew's physical care. Allison also maintains the court erred in denying her request to reopen the record to present additional evidence. She challenges the court's valuation of the marital residence, its failure to require Matthew to refinance the debt on the house, and its calculation of her child support obligation. Upon our de novo review, we affirm.

**I. Background Facts and Proceedings.**

Matthew and Allison were married in August 2001. Both were twenty-six years old at that time. It was the first marriage for both parties. They had two children, a son, J.M., born in January 2004, and another son, H.M., born in September 2005.

Matthew is in good health and has no physical limitations. Matthew grew up in Fort Madison. He attended college after graduating from high school; worked at a bank in Florida in 1997; and moved to Cincinnati, Ohio, where he worked for two years. Matthew later lived in Coralville, Iowa, and worked for Brenton Bank and then Wells Fargo as a mortgage agent. After the parties married in 2001, they moved to Des Moines while Allison worked on her certification to be a physician's assistant (PA). Matthew continued to work as a mortgage agent for Wells Fargo. The parties moved to Fort Madison in 2002 where Matthew began his employment with the Fort Madison Bank & Trust. Matthew was promoted to bank president in 2006. In 2011, Matthew's gross

annual income was $179,777, about $150,000 of which is salary, the remainder being benefits and a bonus. He has an employer-sponsored health benefit plan available; the monthly cost to cover the children for medical and dental insurance is $599.

Allison finished her undergraduate degree requirements in southeast Iowa and earned a Bachelor of Science in 1998. In 2003, Allison became a PA. In August 2003, she went to work as a PA at Fort Madison Physicians & Surgeons and was employed there until October 2004. She then worked at Infinity Medical Clinic in Fort Madison until December 2007, when the clinic closed. Allison returned to Fort Madison Physicians & Surgeons in January 2008. However, Allison resigned in March 2010. At that time, she was covered by a two-year, sixty-mile-radius, non-compete clause that prohibited her from working as a PA in the Fort Madison area. From May 2010 to January of 2011, Allison worked in sales for Tri-Medical Solution.

In 2010, Allison began experiencing severe emotional problems.[1] In November 2010, Allison began outpatient counseling with Dr. Janeta Tansey. Her condition became severe enough that for ten days during January 2011 she entered an inpatient program at Mercy Hospital in Iowa City. Allison was diagnosed with anorexia nervosa and post-traumatic stress disorder (PTSD). After leaving Mercy, Allison's condition worsened, and she began inpatient treatment at the University of Iowa Hospitals from February 2 through 21, 2011. She left that program against medical advice. Her physical health worsened in

---

[1] Allison had some history of emotional issues, including an undiagnosed eating disorder and a suicide attempt during her teenage years and an episode of suicidal ideation when in college.

late February. Allison entered a long-term inpatient program at a Denver, Colorado, hospital in March 2011. Allison stated she completed the program; Matthew felt she had not because she had not filled out her wellness plan prior to discharge. She returned home to Fort Madison in mid-May 2011.

Still covered by the non-compete agreement, Allison began working in September 2011 at the University of Iowa Community Medical Services office in Coralville, Iowa. She worked approximately three ten-hour days per week and was paid forty dollars per hour. Allison would spend one or two nights per week in Coralville, staying at a motel or with relatives.

Before her hospitalizations, Matthew and Allison were both actively involved in the children's care. Matthew became the boys' sole caregiver for several months in early 2011. Upon Allison's return, both parents again provided care for the children, although Matthew was necessarily the primary caregiver when Allison was at work in Coralville.

Matthew filed a dissolution petition in March 2012. Following several motions and orders related to the temporary care and support of the children (including Matthew's request for a temporary injunction to prohibit Allison from moving the boys from Fort Madison and enrolling them in school in Iowa City),[2] the court sua sponte appointed a guardian ad litem (GAL) for the children. After an extensive investigation, the GAL recommended the children remain enrolled in their Fort Madison school.

---

[2] After the parties separated, they alternated living in the marital residence for one-week periods caring for the children. In July 2012, Allison's parents purchased a residence for Allison in the Coralville area.

On August 9, 2012, the district court entered a ruling granting Matthew's application for a temporary injunction prohibiting Allison from registering the children for school at an elementary school in Coralville. To provide a "modicum of stability" for the children, the court enjoined the parties from removing the children from their current school system until further order of the court.

On September 5, 2012, the GAL filed a supplemental report in which she noted the children were "very bonded to both of their parents and are comfortable in both of their homes. Both parties love these boys very much, but are having a difficult time shielding the children from the divorce process as emotions are running on overdrive during this time." The GAL recommended the court order temporary physical care of the children with Matthew:

> Taking all things into consideration, I believe the most important factor to look at is the continuity and routine of the boys. It is a fact that the boys like their home in Fort Madison and the boys are comfortable there. They have many friends and a huge support system in the Fort Madison area to include both Matt and Allison's families. The boys have attended and been involved with the Holy Trinity School system since they were [two] years old. Fort Madison is where they have grown up so far. Many of the people who are the closest with the boys all voiced concerns they will not be happy on a long term basis in Iowa City away from their friends and family.

On September 10, 2012, the court entered an order on temporary matters. The court noted the parties had initially shared care of the children, but that arrangement was no longer possible. The court concluded:

> Children the ages of [J.M.] and [H.M.] suffer a substantial amount of disruption in their lives when their family unit is dissolved when their parents separate. Such disruption and substantial change typically has a negative impact on children. In this case the parties report that both [children] are suffering emotionally because of the changes in their family structure. Consequently, the court should do nothing in its order on temporary matters that will exacerbate the

stresses the children are enduring at this time. The court concludes that leaving the children in the home where they have lived their entire lives and in the community where they have lived their entire lives is the least disruptive thing the court can do to them at this stage of the proceeding.

The children were placed in Matthew's physical care, and Allison was granted "reasonable and liberal visitation." Allison was ordered to pay temporary child support in the amount of $145.57 per week.

On January 5, 2013, the GAL filed a report with the court, which was admitted at trial. Though extensive and detailed, the report can be summed up,

Taking all the drama and noise out of the equation, both parents are perfectly capable of caring for these boys. Maintaining their routine and way of life is what I believe we must look to.
. . . .
. . . [T]hese boys need consistency and routine and I believe they are best able to achieve that during the school year in Fort Madison. I further believe that because the children are so bonded to both of their parents, that they should be spending a significant amount of time with both parents.

The GAL thus recommended physical care remain in Fort Madison during the school year with Matthew and that the boys "spend the summer with Allison." The GAL recommended the parent not providing physical care receive liberal visitation to maximize the children's time with each parent. The GAL further recommended family counseling for the "entire family" so "both parties can do a better job of putting the boys' interests ahead of their own."

A lengthy dissolution trial was held on January 7, 8, and 25; February 19; May 17; and June 6, 2013. An order establishing summer vacation was filed on June 11, 2013. Allison's motion to reopen the record filed on June 27 was denied.

On October 1, 2013, the court entered a dissolution decree placing the children in Matthew's physical care. The court stated, "The children's placement in the Fort Madison area provides them the most family support and this placement will be the least disruptive to their mental and emotional growth. Placing the children with Matthew will most likely bring them to healthy physical, mental, and social maturity."

The district court found Allison earned $62,400 working three, ten-hour shifts per week. The court concluded Allison should be attributed an earning capacity of $70,000 and ordered Allison to pay $222 per week in child support.

The court awarded Matthew the marital residence, which was encumbered by a first mortgage in the amount of $409,420 and a second mortgage in the amount of $116,192. Though noting the replacement cost of the house exceeded $690,000, the court observed the real estate appraisals ranged from $402,000 to $665,000. The court assigned a value of $520,000 to the residence. The court assigned the first and second mortgage debt to Matthew and ordered Allison be "saved harmless" on the debt. Under the decree, Matthew was to receive assets with a net value of $174,336 and Allison was to receive assets with a net value of $43,953. The court ordered Matthew to transfer $65,000 from his 401(k) account to Allison by Qualified Domestic Relations Order (QDRO).

On October 9, Allison filed a motion for new trial in which she asked the court to take additional evidence concerning post-trial events. She also asked the court to amend the decree to require Matthew to refinance the first and second mortgages on the marital residence to remove her name. The court denied the post-trial motions, and Allison appeals.

Allison argues she should have been granted physical care of the children. She further contends the court erred in failing to reopen the record to allow her to present further evidence, asserting the information had to do with Matthew's moral character. Allison challenges the court's valuation of the marital residence. She contends the court erred in failing to require Matthew to refinance the mortgages to remove her name and in calculating her child support based upon imputed income instead of her actual income.

## II. Scope and Standard of Review.

We review dissolution cases de novo. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). We give weight to the district court's findings, especially regarding the credibility of witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g). "Precedent is of little value as our determination must depend on the facts of the particular case." *In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995).

We review the trial court's decision whether to reopen the record for an abuse of discretion. *Sun Valley Iowa Lakes Ass'n v. Anderson*, 551 N.W.2d 621, 634 (Iowa 1996).

## III. Discussion.

***A. Physical Care.*** In any custody determination, the primary consideration is the best interests of the children. *See* Iowa Code § 598.41(a) (2011);[3] *In re Marriage of Hansen*, 733 N.W.2d 683, 695 (Iowa 2007).

---

[3] Section 598.41(a) provides:

> The court may provide for joint custody of the child by the parties. The court, insofar as is reasonable and *in the best interest of the child*, shall order the custody award, including liberal visitation rights where

> Physical care issues are not to be resolved based upon perceived fairness to the *spouses*, but primarily upon what is best for the *child*. The objective of a physical care determination is to place the children in the environment most likely to bring them to health, both physically and mentally, and to social maturity.

*Hansen*, 733 N.W.2d at 695. We consider numerous factors, including but not limited to the suitability of parents, whether the psychological and emotional needs and development of the children will suffer from lack of contact with and attention from both parents, the quality of parental communication, the previous pattern of caregiving by the parents, and each parent's support of the other. *See id.*

In assessing a custody order, we give considerable weight to the judgment of the district court, which had the benefit of hearing and observing the parties firsthand. *In re Marriage of Ford*, 563 N.W.2d 629, 630-31 (Iowa 1997). We have carefully reviewed all the evidence and the district court's rulings. The district court noted each party's positive parental qualities:

> The children are closely bonded to Matthew and enjoy the stability and continuity of being able to reside in the marital residence, the home they have lived in since it was reconstructed after the fire. In Matthew's physical care, the children can continue to attend Holy Trinity School. The children enjoy Holy Trinity and have many friends there. Matthew holds a responsible position with a local bank, earns a significant income, and can provide for the material needs of the children. Matthew is even-tempered and patient with the children. Moreover, he can provide for their emotional needs. Matthew perceived a need for the children to undergo counseling due to the high level of conflict between the parents. Matthew

---

> appropriate, which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents after the parents have separated or dissolved the marriage, and which will encourage parents to share the rights and responsibilities of raising the child unless direct physical harm or significant emotional harm to the child, other children, or a parent is likely to result from such contact with one parent.

(Emphasis added.)

encourages the children to be involved in outside activities such as baseball, football and golf. Matthew works closely with school officials and attends school functions for the children. When Matthew is at work or a meeting, and cannot take care of the children, he has access to responsible individuals for child care. Often, Matthew's mother will provide child care to the children. She lives nearby and has a close, loving relationship with the children. Allison's parents (the children's maternal grandparents) and the children's cousins all live in Burlington, which is approximately [twenty] miles away. Matthew encourages and promotes the relationship between the children and their other relatives. Matthew has attended to all of the children's medical and dental needs. He has scheduled appointments and made arrangements for this care.

. . . .

. . . Allison enjoys a close and loving relationship with the children. Even though she has not had primary physical care the past year, she has maintained a close relationship with the children, exercises all of her visitation, and speaks to the children by telephone daily. Allison lives in a comfortable residence in a good neighborhood in Coralville. The children's educational needs would be well met by the school they would attend if they resided in Coralville. Allison has made plans for appropriate child care if she were awarded physical care. Allison holds a responsible position as a physician's assistant and earns an adequate income, so she could provide for the children's material needs. Allison has paid all court-ordered child support. Allison enjoys outdoor activities, as does [J.M.] She takes the children on walks in the woods, rides with them on ATVs, and takes [J.M.] hunting. When her schedule permits, Allison takes the children to the home of her parents in Burlington. Allison's parents enjoy a close, loving relationship with the children. Allison has tried hard to stay in touch with the children's teachers, school officials, and she has tried to attend activities the children are involved with in school. Allison has participated in decisions made for the children's medical and dental care.

The trial court also acknowledged both parents' extensive criticisms of the other, which we find no reason to repeat here.

The trial court concluded, and we agree, "The children have enjoyed a great deal of stability in Matthew's physical care." The trial court wrote:

The Court does not doubt the sincerity of Allison's desire that the children live with her in Coralville, but in determining the award of physical care, it is the best interests of the children which must

guide the Court, not the interest of the parent seeking physical care. Uprooting these young children from their familiar surroundings in Fort Madison would be difficult, unsettling, and traumatic. The children have already had to endure the separation of their parents. It would be cruel to require them to leave the home in which they have resided all of their lives, their neighborhood, school, friends, relatives, and community. Moreover, Matthew has been the children's past joint caretaker, sometimes their sole caretaker, and for at least two of the previous three years, their primary caretaker. The children should not be forced to be separated from him. Allison is a fit parent, but she has a history of emotional problems. She becomes frustrated with the children, sometimes yells at them, and has used inappropriate discipline. She is able to take care of the children for short periods of time, but simply does not have the emotional endurance to act as the children's primary caretaker over the long haul. . . .

The Court concludes placement of physical care of the children with Matthew is in their best interests because Matthew can minister more effectively to their present and future needs. The children's placement with Matthew in the Fort Madison area provides them the most family support and this placement will be the least disruptive to their mental and emotional growth. Placing the children with Matthew will most likely bring them to healthy physical, mental, and social maturity. The Court concludes Matthew shall be awarded physical care of [the children]. Allison shall be awarded visitation.

On appeal, Allison expends considerable time and emotional energy focusing on several points she feels should tip the scales in favor of her having physical care of the children. First, she argues her move to Coralville should not be held against her because she did not "choose" to move away, but rather was required to go where work was available (and not prohibited by the non-compete clause) when she was "kicked out of the house." She notes she only works three days per week so has more time to be available to the children. She next points out several instances of Matthew's conduct she argues establish his bad moral character. She also maintains the trial court overlooked or ignored "virtually all of Matthew's egregious acts and deficiencies."

Upon our de novo review, and given the objective of a physical care determination—to place the children in the environment most likely to bring them to healthy physical, mental, and social maturity—we believe the stability offered by Matthew, coupled with the children's close relationships with the extended family in Fort Madison, tip the scales in favor of placing the children in Matthew's physical care. The district court also gave additional sound and ample reasons for the physical care award, which are supported by the record. We do not criticize Allison for her move to Iowa City for employment purposes, but the non-compete clause terminated shortly after the dissolution action was filed. Notwithstanding, she chose to stay in Iowa City even though the children appear to be flourishing and grounded in Fort Madison.

Both parents obviously love their children and are capable parents, but like any parent they have their strengths and weaknesses. Both parties have exhibited less than perfect conduct during these extended dissolution proceedings. The children will benefit if the parties can get beyond their personal grievances with one another, protect their children from their own animosity toward the other, and focus on their children's needs and healthy development.

*B. Reopening Record.* The sixth day of trial was held on June 6, 2013. Matthew was questioned about his relationship with his girlfriend on that date. On June 27, Allison filed a motion to reopen the evidence on the ground Matthew was now having his girlfriend "regularly stay overnight" while the children were present in his residence. The trial court denied the motion, finding it had "ample evidence from which to make a decision on the contested issues presented."

The trial court has broad discretion in deciding whether to reopen a case for the reception of additional evidence. *See Bangs v. Maple Hill, Ltd.*, 585 N.W.2d 262, 267 (Iowa 1998) (noting "a trial court in its discretion may allow reopening of the case at any stage of the trial"); *Sun Valley Iowa Lakes Ass'n*, 551 N.W.2d at 634. We acknowledge the district court did not have the benefit of trial testimony from Matthew's girlfriend, and her absence is somewhat disconcerting in light of her presence in Matthew's life. But we note the GAL's concern did not relate to the girlfriend's character or her relationship with the children. Notwithstanding, given the extended nature of these proceedings and the extensive record already before the trial court, we find no abuse of discretion here.

***C. Property Valuation.*** Allison argues the trial court erred in valuing the marital residence. This residence was built after the parties' house burned in 2007 and was a total loss. Both parties testified the other overspent in rebuilding and furnishing the home—as the trial court found, the replacement case for the current home "probably exceeds $690,000." One real estate appraiser, Tammy Luckenbill, provided a valuation of the house at $595,000. However, she testified there were no comparable sales to use to establish a market value because the highest sale price for a house in the Fort Madison area in the "last few years" was $395,000. Another appraiser, Margaret Coleman, valued the house at $402,000. Other evidence established Matthew had refinanced the house in August 2011 based upon a valuation of $683,400.

As was stated in *Hansen*, 733 N.W.2d at 703, "Ordinarily, a trial court's valuation will not be disturbed when it is within the range of permissible

evidence." Upon our de novo review of the various valuations and supporting testimony, we conclude the trial court's valuation is within the range of permissible evidence and should not be disturbed. In her appellate brief, Allison "concedes, as her own appraiser recognized, that the current housing market in the Fort Madison area may not reflect a valuation that matches the cost of this home."

*D. Hold Harmless.* The decree awarded Matthew the martial residence and ordered him to pay the debts thereon (the first mortgage in the amount of $409,420; the second mortgage in the amount of $116,192). The decree states, "Allison will be saved harmless."

Matthew twice testified he would hold Allison harmless, though he also testified he was not sure if he would be able to refinance the property. On the final day of trial, the following occurred:

> [ATTORNEY BRAY] Q. What is the current mortgage on the house? [MATTHEW] A. Current right now combined, about 524, I think.
> Q. Should there be a refinancing ordered by the Court, are you capable of doing that financing at this time? A. I'm not sure yet. It—Because of the market and the sales, I'm not sure if I'll be able to get it refinanced.
> Q. If you're unable to obtain refinancing, are you willing to hold Allison harmless from the debt on the house? A. Yes.

Allison contends the trial court erred in not requiring Matthew to refinance the house to remove her name. We find no reason to modify the decree. Allison presented no evidence that her credit standing or ability to obtain financing would be affected other than her own opinion.

In light of the debt owed against the home, the trial court could have determined that requiring refinancing was not reasonable under the housing

market conditions and that Allison was adequately protected by the decree's "hold harmless" provision. *Cf. In re Marriage of Ginsberg*, 750 N.W.2d 520, 522 (Iowa 2008) (finding former spouse was permitted to seek enforcement of a dissolution decree's "hold harmless" provision in a later proceeding).

***E. Child Support.*** Allison next argues the court erred in calculating her child support obligation. She maintains the trial court did not make the necessary finding to base her child support obligation on earning capacity rather than actual earnings.

"Before applying the guidelines there needs to be a determination of the net monthly income of the custodial and noncustodial parent at the time of the hearing." *In re Marriage of Kupferschmidt*, 705 N.W.2d 327, 332 (Iowa Ct. App. 2005). Iowa Court Rule 9.11 provides:

> The court shall not vary from the amount of child support which would result from application of the guidelines without a written finding that the guidelines would be unjust or inappropriate as determined under the following criteria:
> (1) Substantial injustice would result to the payor, payee, or child(ren).
> (2) Adjustments are necessary to provide for the needs of the child(ren) and to do justice between the parties, payor, or payee under the special circumstances of the case. . . .

Pursuant to Iowa Court Rule 9.11(4), the court "may impute income in appropriate cases." That paragraph continues:

> If the court finds that a parent is voluntarily unemployed or underemployed without just cause, child support may be calculated based on a determination of earning capacity. A determination of earning capacity may be made by determining employment potential and probable earnings level based on work history, occupational qualifications, prevailing job opportunities, earning levels in the community, and other relevant factors. The court shall not use earning capacity rather than actual earnings or otherwise impute income *unless a written determination is made that, if actual*

*earnings were used, substantial injustice would occur <u>or</u> adjustments would be necessary to provide for the needs of the child(ren) <u>or</u> to do justice between the parties.*

Iowa Ct. R. 9.11(4) (emphasis added). The required findings highlighted are separated by the term "or"—the three alternative findings are used in the disjunctive. *See Kelly v. Sinclair Oil Corp.*, 476 N.W.2d 341, 346 (Iowa 1991) ("[W]hen the word 'or' is used in a statute, it is presumed to be disjunctive unless a contrary intent appears."), *abrogated on other grounds by Thompson v. Kaczinski*, 774 N.W.2d 829, 836 (Iowa 2009).

Here, Allison testified she could make $83,200 per year if she worked full-time in her present position. However, she maintained a thirty-hour-work week, which allowed her flexibility and more time to be available for her children. When asked if she could be a full-time employee, Allison testified, "Yes and no." "Yes, I could. But, no, I need to make sure that I have instilled Wednesdays off for visitations with my children and that I—only one weekend day a month." She acknowledged she had worked extra shifts to cover when someone else was ill.

The district court noted Allison's gross annual income working three ten-hour days per week was $62,400. The court also found, "Allison's tax return showed gross annual income of $65,000 for 2012. Based on a recent check stub for which Allison worked 67.52 hours during a two-week pay period, Allison would earn, on an annualized basis, $70,220 per year." The court concluded,

> Allison should be attributed earning capacity of $70,000 per year. This conclusion is justified under the special facts of this case to avoid substantial injustice to Allison [sic], and such adjustment is necessary to do justice between the parties and the children. This figure takes into account Allison's educational background, her emotional and physical condition, and her earning history over the past five years. *See* Iowa Child Support Guideline Rule 9.11(1)

and (2). *See also In re Marriage of Salmon*, 519 N.W.2d 94, 97 (Iowa Ct. App. 1994). Therefore, for the purpose of calculating Allison's child support obligation, Matthew earns gross annual income of $179,777 and Allison earns gross annual income, based on earning capacity, of $70,000.

The district court found that it used Allison's earning capacity because it "is necessary to do justice between the parties." Although we could conclude the court's finding related to Allison's earning capacity is supported by the record and its written finding is sufficient to vary from the child support guidelines under rule 9.11(4), there was also evidentiary support to conclude her current income is $70,000. The court found that based upon Allison's latest pay stub, and by extrapolating that sum for the whole year, Allison earned in excess of $70,000 gross income. Thus, even disregarding the district court's usage of earning capacity, we conclude the child support was properly calculated based upon Allison having gross annual income of $70,000.

Upon our de novo review, we affirm the dissolution decree in its entirety.

## IV. Appellate Attorney Fees.

Matthew seeks an award of appellate attorney fees. Appellate attorney fees are not a matter of right, but rest in the court's discretion. *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). We consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *In re Marriage of Geil*, 509 N.W.2d 738, 743 (Iowa 1993). In light of Matthew's significantly greater income, we determine each party shall pay his or her own attorney fees.

**V. Conclusion.**

We affirm the placement of the parties' two children in Matthew's physical care. Given the extended nature of these proceedings and the extensive record already before the trial court, we find no abuse of discretion here in the court's denial of Allison's request to reopen the record. The court's valuation of the marital residence is within the range of permissible evidence and will not be disturbed. Nor do we require Matthew to refinance the debt on the house—in light of the debt owed against the home, the trial court could have determined that requiring refinancing was not reasonable under the housing market conditions and that Allison was adequately protected by the decree's "hold harmless" provision. Finally, we conclude the child support was properly calculated based upon Allison having gross annual income of $70,000. We award no appellate attorney fees.

Costs on appeal are assessed to Allison.

**AFFIRMED.**